1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   JIMMY GREER, individually, and on          No.  2:15-cv-01063-KJM-CKD
     behalf of others similarly situated,
12
                Plaintiff,
13                                              ORDER

14        v.

15   DICK'S SPORTING GOODS, INC., a
     Delaware corporation; and DOES 1
16   through 100,[1] inclusive,

17                Defendants.

18

19          Plaintiff Jimmy Greer seeks to represent a class of current and former Dick's

20   Sporting Goods ("DSG") employees in California for violations related to two alleged practices:

21   (1) requiring employees to wait, while already off the clock, for an inspection of their personal

22

23          [1] The Ninth Circuit provides "'[plaintiffs] should be given an opportunity through
     discovery to identify [] unknown defendants'" "in circumstances . . . 'where the identity of the
24   alleged defendant[] [is] not [] known prior to the filing of a complaint.'"  *Wakefield v. Thompson*,
     177 F.3d 1160, 1163 (9th Cir. 1999) (quoting *Gillespie v. Civiletti*, 629 F.2d 637, 642 (9th Cir.
25   1980)) (modifications in original). Plaintiff is cautioned that such defendants will be dismissed
     where "'it is clear that discovery would not uncover the identities, or that the complaint would be
26   dismissed on other grounds.'"  *Id.* (quoting *Gillespie*, 629 F.2d at 642).  Federal Rule of Civil
     Procedure 4(m), as recently amended, provides for dismissal of defendants not served within 90
27   days of filing of the complaint unless plaintiff shows good cause. *See Glass v. Fields*, No. 1:09-
     cv-00098-OWW-SMS PC, 2011 U.S. Dist. LEXIS 97604 (E.D. Cal. Aug. 31, 2011); *Hard Drive
28   Prods. v. Does*, No. C 11-01567 LB, 2011 U.S. Dist. LEXIS 109837, at *2-4 (N.D. Cal. Sep. 27,
     2011).

                                         1

belongings before exiting the store; and (2) requiring employees to purchase apparel appropriate to their department without reimbursing employees for clothing-related expenses. *See generally* First Am. Compl. (FAC), ECF No. 14. The parties filed cross-motions regarding certification of the putative class. *See* Pl.'s Mot. Certify (Pl.'s Mot.), ECF No. 23; Def.'s Mot. Deny Certification (Def.'s Mot.), ECF No. 24. For the reasons discussed below, the court finds class certification is appropriate and therefore GRANTS plaintiff's motion to certify the class and DENIES defendant's motion.

## I.  BACKGROUND

### A.  Procedural Background

Greer filed this action on March 18, 2015, in the Superior Court for the County of Sacramento. Compl., ECF No. 1-1. On May 15, 2015, DSG removed the action to this court. ECF No. 1. On October 10, 2015, Greer filed the operative complaint. *See* FAC.

On July 29, 2016, the parties filed opposing motions regarding certification.[2] The parties opposed each other's motions and replied.[3] While litigating the certification issue, the parties filed motions to strike each other's declarations offered in support of the certification motions, and both sides opposed and then replied.[4] Greer also filed a request for judicial notice, which DSG opposed.[5]

The court held a hearing on all the motions on December 16, 2016. ECF No. 41. Melissa Grant and Robert Drexler appeared for Greer, and Paul Cowie and Caryn Horner appeared for DSG. *Id*.

### B.  Factual Background and Claims

DSG is a national full-line sporting goods retailer that sells sports equipment, apparel, and footwear. Craig Decl. ¶ 3, ECF No. 24-2. From March 19, 2011 through the

---

[2] *See* Pl.'s Mot.; Def.'s Mot.
[3] *See* Pl.'s Opp'n, ECF No. 28; Def.'s Opp'n, ECF No. 27; Pl.'s Reply, ECF 34; Def.'s Reply, ECF No. 33.
[4] *See* Pl.'s Mot. Strike, ECF No. 29; Def.'s Mot. Strike, ECF No. 35; Pl.'s Opp'n Strike, ECF No. 37; Def.'s Opp'n Strike, ECF No. 36; Pl.'s Reply Strike, ECF No. 39; Def.'s Reply Strike, ECF No. 38; *see also* Def.'s Objs., ECF No. 27-4.
[5] *See* Req. J. Notice (RJN), ECF No. 23-6; Opp'n RJN, ECF No. 27-3.

present, DSG has employed approximately 8,438 employees across 38 stores in California. *Id.* ¶ 4.

Greer worked as a non-exempt, hourly-paid employee from approximately May 2011 to October 2012 at DSG's Fresno store location. Greer Decl. ¶ 2, ECF No. 23-4. While employed, Greer worked full-time as a Key Carrier and Sales Leader in DSG's Hunting Department. *Id.*

This putative class action arises from two central claims. First, Greer alleges DSG does not compensate employees for time worked off the clock while waiting for an inspection of their personal belongings before exiting the store, which DSG conducts as part of its loss prevention policy. *See generally* FAC. Second, Greer alleges DSG requires employees to purchase apparel appropriate to their assigned department without reimbursing employees for these clothing-related expenses. *Id.* Greer asks the court to certify the following eight claims for class treatment: (a) Violation of California Labor Code sections 510 and 1198 (Unpaid Overtime); (b) Violation of California Labor Code sections 1194, 1197 and 1197.1 (Unpaid Minimum Wages); (c) Violation of California Labor Code sections 201 and 202 (Wages Not Timely Paid Upon Termination); (d) Violation of California Labor Code section 204 (Wages Not Timely Paid During Employment); (e) Violation of California Labor Code section 226(a) (Non-Compliant Wage Statements); (f) Violation of California Labor Code section 2802 (Unpaid Business Expenses); and (g) Violation of California Business & Professions Code sections 17200, *et seq*. Pl.'s Notice of Mot. Certify 2–3, ECF No. 23.[6]

C.   Class Definitions

Greer seeks certification of two subclasses corresponding to each of his two central claims:

> All non-exempt or hourly paid employees who worked for Defendant in its DSG retail stores within California at any time from March 18, 2011 until January 31, 2015 (the "Security Check Class").

---

[6] Among these claims, those identified here as (d) and (e) are not specifically listed in the operative complaint. *See generally* FAC. The court therefore determines whether to certify the putative subclasses based on the remaining five claims.

3

and

> All non-exempt or hourly paid employees who worked for Defendant in its DSG retail stores within California at any time from March 18, 2011 until the date of certification (the "Business Reimbursement Class").

Pl.'s Mot. 10.  As Greer explains, the Security Check Class is limited to activity up to January 31, 2015, because DSG contends it ended its practice of off-the-clock security checks that month by installing punch-out clocks by store exits.  *Id.* at 10 n.4.  Although the first amended complaint proposes a general class, FAC ¶ 13, Greer here seeks certification only of the two subclasses.  Pl.'s Mot. 10.

## II.    CLASS ACTIONS GENERALLY

Litigation by a class is "an exception to the usual rule" that only the individual named parties bring and conduct lawsuits.  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (citation and internal quotation marks omitted).  Only when a class action "promot[es] . . . efficiency and economy of litigation," should a motion for certification be granted.  *Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 349 (1983).  A court considers whether class litigation promotes "economies of time, effort and expense, and . . . uniformity of decisions as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results."  Fed. R. Civ. P. 23(b)(3) advisory committee's note to 1966 amendment.

To be eligible for certification, the proposed class must be "precise, objective, and presently ascertainable."  *Williams v. Oberon Media, Inc.*, No. 09-8764, 2010 WL 8453723, at *2 (C.D. Cal. Apr. 19, 2010); *see also* 7A Charles Alan Wright et al., *Federal Practice and Procedure* § 1760 (3d ed. 2005) ("If the general outlines of the membership of the class are determinable at the outset of the litigation, a class will be deemed to exist."  (citations omitted)).  The proposed class definition need not identify every potential class member from the very start.  *See, e.g.*, *Doe v. Charleston Area Med. Ctr., Inc.*, 529 F.2d 638, 645 (4th Cir. 1975); *O'Connor v. Boeing N. Am., Inc.*, 184 F.R.D. 311, 319 (C.D. Cal. 1998).  The requirement is a practical one.  It is meant to ensure the proposed class definition will allow the court to efficiently and objectively ascertain whether a particular person is a class member, *see In re TFT-LCD (Flat Panel) Antitrust*

4

*Litig.*, 267 F.R.D. 583, 592 (N.D. Cal. 2010), for example, so that each putative class member can receive notice, *O'Connor*, 184 F.R.D. at 319.

Class certification is governed by Federal Rule of Civil Procedure 23. The court must first determine whether to certify a putative class, and if it does, it must then define the class claims and issues and appoint class counsel. Fed. R. Civ. P. 23(c)(1), (g). Under Rule 23(c)(5), for purposes of certification, a subclass is treated exactly like a class. To be certified, a putative class must meet the threshold requirements of Rule 23(a) and the requirements of one of the subsections of Rule 23(b), which defines three types of classes. *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 512 (9th Cir. 2013). Here, Greer seeks certification only under Rule 23(b)(3), which provides for certification of a class where common questions of law and fact predominate and a class action is the superior means of litigation. Pl.'s Mot. 10–11.

Rule 23(a) imposes four requirements on every class. First, the class must be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Second, questions of law or fact must be common to the class. Fed. R. Civ. P. 23(a)(2). Third, the named representatives' claims or defenses must be typical of those of the class. Fed. R. Civ. P. 23(a)(3). And fourth, the representatives must "fairly and adequately protect the interests of the class." *Id.* Fed. R. Civ. P. 23(a)(4). If the putative class meets these requirements, Rule 23(b)(3) imposes two additional requirements: first, "that the questions of law or fact common to class members predominate over any questions affecting only individual members," and second, "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." The test of Rule 23(b)(3) is "far more demanding," than that of Rule 23(a). *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1172 (9th Cir. 2010) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623–24 (1997)).

"The party seeking class certification bears the burden of demonstrating that the requirements of Rules 23(a) and (b) are met." *United Steel, Paper & Forestry, Rubber, Mfg. Energy, Allied Indus. & Serv. Workers Int'l Union, AFL-CIO C.L.C. v. ConocoPhillips Co.*, 593 F.3d 802, 807 (9th Cir. 2010). This burden is real; Rule 23 embodies more than a "mere pleading standard." *Wal-Mart*, 564 U.S. at 350. The party must "prove that there are *in fact*

5

sufficiently numerous parties, common questions of law or fact, etc." *Id.* (emphasis in original).

The trial court must then conduct a "rigorous analysis" of whether the party has met its burden,

*id.*, and "analyze each of the plaintiff's claims separately," *Berger v. Home Depot USA, Inc.*, 741

F.3d 1061, 1068 (9th Cir. 2014) (citing *Erica P. John Fund, Inc., v. Halliburton Co.*, 563 U.S.

804, 809 (2011)). The court must verify the putative class's "actual, not presumed, conformance

with Rule 23(a) . . . ." *Wal-Mart*, 565 U.S. at 351 (alterations omitted) (quoting *Gen. Tel. Co. of

Sw. v. Falcon*, 457 U.S. 147, 160 (1982)). This inquiry often overlaps with consideration of the

merits of the plaintiffs' substantive claims. *Wal-Mart*, 564 U.S. at 351–52. Indeed, "a district

court *must* consider the merits if they overlap with the Rule 23(a) requirements." *Ellis v. Costco

Wholesale Corp.*, 657 F.3d 970, 981 (9th Cir. 2011) (emphasis in original) (citing *Wal-Mart*, 564

U.S. at 351–52); *see also Comcast Corp. v. Behrend*, ___ U.S. ___, 133 S. Ct. 1426, 1433 (2013)

("[O]ur cases requir[e] a determination that Rule 23 is satisfied, even when that requires inquiry

into the merits of the claim."). These same "analytical principles" also apply to the court's

analysis of whether the plaintiff meets its burden under Rule 23(b). *Comcast*, 133 S. Ct. at 1432.

III.    EVIDENTIARY ISSUES

As noted above, the parties move to strike each other's declarations offered in

support of their motions regarding certification. Pl.'s Mot. Strike; Def.'s Mot. Strike. Both

parties rely on Federal Rule of Civil Procedure 37, which prohibits a party from using

information improperly disclosed under Rule 26, which in turn requires supplemental disclosure

"in a timely manner" if a party learns that an initial disclosure is incomplete. Fed. R. Civ. P.

37(c)(1); Fed. R. Civ. P. 26(e). Failure to make a timely disclosure results in exclusion unless the

failure was "substantially justified" or "harmless." Fed. R. Civ. P. 37(c)(1); *Hoffman v. Constr.

Protective Serv., Inc.*, 541 F. 3d 1175, 1179 (9th Cir. 2008). "In determining whether to preclude

introduction of evidence under FRCP 37, courts consider '(1) the surprise to the party against

whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the

extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence,

and (5) the nondisclosing party's explanation for its failure to disclose the evidence.'"

*S.F. Baykeeper v. W. Bay Sanitary Dist.*, 791 F. Supp. 2d 719, 733 (N.D. Cal. 2011) (citing *Dey,*

1     *L.P. v. Ivax Pharm., Inc.*, 233 F.R.D. 567, 571 (C.D. Cal. 2005)); *see also Naff v. State Farm*

2     *Gen. Ins. Co.*, No. 1:15-CV-00515-JLT, 2016 WL 4095948, at *9 (E.D. Cal. Aug. 2, 2016).

3        Here, each party's request is similar. Class certification-related fact discovery

4     closed on March 29, 2016, Order, ECF No. 13, and both parties only generally disclosed "all

5     putative class members" or "the putative class" as potential witnesses before that date, Def.'s

6     Mot. Strike 6; Pl.'s Mot. Strike 6. Each party submitted supplemental Rule 26 disclosures

7     identifying the prospective declarants only after the cut-off date. *See* Pl.'s Mot. Strike 4; Def.'s

8     Mot. Strike 4. Although submitted after the discovery cut-off, the supplemental disclosures were

9     made before the parties' certification motions here were filed. *See* Pike Decl. ¶¶ 4–10, ECF No.

10    29-1; Drexler Decl. ¶¶ 8–20, ECF No. 37-1. In these circumstances, the declarations should

11    surprise no one. Accordingly, the court DENIES both motions to strike.

12       The court also DENIES DSG's objections to the class member declarations. *See*

13    Def.'s Objs. "Numerous courts in this circuit have made clear that '[f]or purposes of the class

14    certification inquiry, the evidence need not be presented in a form that would be admissible at

15    trial.'" *Brown v. Abercrombie & Fitch Co.,* CV141242JGBVBKX, 2015 WL 9690357, at *5

16    (C.D. Cal. July 16, 2015) (citing *Stitt v. S.F. Mun. Transp. Agency*, No. 12-CV-3704 YGR, 2014

17    WL 1760623, at *1 n. 1 (N.D. Cal. May 2, 2014)). "The court need not address the ultimate

18    admissibility of the parties' proffered exhibits, documents and testimony at this stage, and may

19    consider them where necessary for resolution of the [motion for class certification]." *Alonzo v.*

20    *Maximus, Inc.*, 275 F.R.D. 513, 519 (C.D. Cal. 2011).

21    IV.     <u>SECURITY CHECK SUBCLASS</u>

22       For each proposed subclass, the court first describes California law applicable to

23    Greer's claims, then summarizes Greer's evidence to support certification, and lastly evaluates

24    whether Greer has met his burden to warrant certification here. Greer's proposed security check

25    subclass relies on his claims tied to off-the-clock work that DSG's policy allegedly required. *See*

26    Pl.'s Mot.

27    /////

28    /////

A.    Applicable Law

In California, wage and hour claims are governed by two sources of law: the California Labor Code and eighteen wage orders adopted by the Industrial Welfare Commission ("IWC"). *Brinker Rest. Corp. v. Superior Court*, 53 Cal. 4th 1004, 1026 (2012). "Wage Orders are entitled to 'extraordinary deference.'" *Id.* at 1027. Indeed, the California Supreme Court treats these two sources of law with equal dignity. *Id.* at 1026. They are to be interpreted "in light of the remedial nature of the legislative enactments" and "liberally construed with an eye to promoting . . . [the] protection [of employees]." *Id.* at 1026–27 (quoting *Indus. Welfare Com. v. Superior Court*, 27 Cal. 3d 690, 702 (1980)).

Greer relies on a principal Wage Order as a basis for his underlying claim of off-the-clock work. Under Wage Order No. 7, "[e]very employer shall pay to each employee, on the established payday for the period involved, not less than the applicable minimum wage for all hours worked in the payroll period, whether the remuneration is measured by time, piece, commission, or otherwise." 8 Cal. Code Regs. § 11070, subd. 4(B). "Hours worked" means "the time during which an employee is subject to the control of an employer, and includes all the time the employee is suffered or permitted to work, whether or not required to do so." *Id.* at 2(G); *see Morillion v. Royal Packing Co.*, 22 Cal. 4th 575 (2000) ("All 15 wage orders contain the same definition of 'hours worked' as does Wage Order No. 14-80, except for IWC wage order Nos. 4-89 and 5-89, which include additional language."). The California Supreme Court has made clear that an employee who is "subject to the control" of his or her employer may be engaged in "hours worked" even if he or she is not "suffered or permitted to work." *Morillion*, 22 Cal. 4th at 584 ("Thus, an employee who is subject to an employer's control does not have to be working during that time to be compensated.").

B.    Evidence

Greer relies on testimony from DSG's corporate designees, deposition testimony of Jim Greer, declarations of putative class members, and documents DSG produced during discovery to support his argument that class members seek relief for the same violations of law based on the application of a uniform policy. Pl.'s Mot. 12–13.

Greer first points to a common policy of performing security checks on employees before exiting the building. DSG's employee handbook, under the heading "Loss Prevention Standards," instructs employees to "[c]arry your jacket, bags, and other personal belongings to the approved associate exit when you leave the building and request that a member of management, Sales Leader or Front End Coordinator inspect your personal belongings." Pl.'s Mot. 13; Pike Decl. Ex. L. The handbook further notes, "[m]anagement reserves the right to inspect all personal belongings at any time." *Id.* Deposition testimony confirms the policy applied not only to bags, but also to jackets. Pike Decl. Ex. G (Kraemer Dep.) 51:24–52:7, ECF No. 23-2. Several of Greer's putative class member declarations further support the conclusion that, even without a bag or jacket, class members may be subject to a visual inspection. *See, e.g.*, Compendium of Class Member Declarations ("Compendium"), ECF No. 23-5; Andrews Decl. ¶ 5 ("These security checks occurred regardless of whether I carried any bags with me . . . I would still have to check in with a manager or co-worker to get approval to leave the store."); Christensen Decl. ¶ 5 (same); Coath Decl. ¶ 5 (same). Moreover, deposition testimony indicates this policy applied to employees any time they left the building, regardless of whether it was the end of the shift or a shift break. Pike Decl. Ex. H (Link Dep.) 52:20–53:15, ECF No. 23-2. Finally, deposition testimony suggests managers were subject to discipline if they did not comply with the security check policy. *Id.* at 35:13–24.

Greer next points to two practices, both of which DSG was aware, that ensured the security check waiting time was conducted off-the-clock. First, at least until January 2015, waiting for and undergoing a security check was necessarily off-the-clock because employees clocked out at the back of the store but underwent security checks in the front of the store. Kraemer Dep. 66:8–17; Pike Decl. Ex. I (Cheng Dep.) 60:1–7, 88:19–24, ECF No. 23-2; *id.* Ex. B (Craig Dep.) 52:18–25, ECF No. 23-2. As of January 2015, DSG began to install a second time clock at the front of the store in response to pending litigation in another case, and employees can now punch out after the security check is complete. Cheng Dep. 53:18–54:3. Second, at least regarding security checks performed at the end of the day, DSG engages in a general practice of having all employees leave at the same time. Kraemer Dep. 58:1–14, 65:19–66:3. For these

reasons, Greer argues class members may spend a significant amount of time off the clock waiting in line to undergo a security check after closing.

Greer's evidence supports the conclusion that the policy and practices described above could combine to create significant off-the-clock waiting time for employees. *See* Compendium; Abdo Decl. ¶ 7 (waiting thirty seconds to five minutes for security checks each day); Akina Decl. ¶ 7 (two to seven minutes waiting each day); Andrews Decl. ¶ 7 (five to ten minutes); Arzola Decl. ¶ 7 (twenty to thirty minutes); Azevedo Decl. ¶ 7 (one to ten minutes); Bateman Decl. ¶ 7 (one to six minutes); Blair Decl. ¶ 7 (five to ten minutes); Borges Decl. ¶ 7 (two to five minutes); Brighton Decl. ¶ 7 (two to five minutes); Brown Decl. ¶ 7 (two to thirty minutes); Christensen Decl. ¶ 6 (ten to thirty minutes); Coath Decl. ¶ 7 (two to five minutes); Cordova Decl. ¶ 7 (two to three minutes); Davenport Decl. ¶ 7 (ten to fifteen minutes, and twenty to thirty minutes for closing shifts); Deblanc Decl. ¶ 7 (two to five minutes, and ten to fifteen minutes for closing shifts); Morales Decl. ¶ 7 (up to twenty minutes).

C.      Certification

Here, DSG does not dispute the requirements of Rule 23(a) have each been met. *See* Def.'s Mot. 13–24. The court finds the proposed security check subclass satisfies the Rule 23(a) requirements of numerosity, commonality, typicality, and adequacy of representation.

The court focuses on the Rule 23(b) requirements of predominance and superiority, which DSG vigorously disputes. *Id.*

1.      Predominance

After establishing the existence of common questions of law or fact, the proponent of a putative class must also establish that these questions "predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). "The predominance analysis under Rule 23(b)(3) focuses on 'the relationship between the common and individual issues' in the case and 'tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'" *Wang v. Chinese Daily News, Inc.*, 737 F.3d 538, 545 (9th Cir. 2012) (quoting *Hanlon v. Chrysler Corp*, 150 F.3d 1011, 1022 (9th Cir. 1998)). Some variation is permitted among individual plaintiffs' claims, *Abdullah v. U.S. Sec. Assocs., Inc.*, 731 F.3d 952, 963 (9th

10

Cir. 2013), but as noted Rule 23(b)(3) is "more demanding than Rule 23(a)," *Comcast*, 133 S. Ct. at 1432.  Courts are thus required "to take a 'close look' at whether common questions predominate over individual ones," *id.* (citation omitted), "begin[ning] . . . with the elements of the underlying cause of action," *Erica P. John Fund, Inc.*, 563 U.S. at 809.  Of course, plaintiffs need not show at the certification threshold that predominant questions will be answered in their favor.  *Amgen, Inc. v. Conn. Ret. Plans & Trust Funds*, ___ U.S. ___, 133 S. Ct. 1184, 1196 (2013).  The court considers the merits only to the extent Rule 23 requires.  *Id.* at 1194–95 (citing *Wal-Mart*, 564 U.S. at 351 n.6).

To establish predominance, the party seeking certification must show: "(1) that the existence of individual injury resulting from the alleged . . . violation . . . [is] capable of proof at trial through evidence that is common to the class rather than individual to its members; and (2) that the damages resulting from that injury [are] measurable on a class-wide basis through use of a common methodology."  *Comcast*, 133 S. Ct. at 1430 (citation and internal quotation marks omitted).  "Rule 23(b)(3), however, does *not* require a plaintiff . . . to prove that each elemen[t] of [her] claim [is] susceptible to classwide proof."  *Amgen*, 133 S. Ct. at 1197 (emphasis and alterations in original) (citation and internal quotation marks omitted).  Similarly, because "'individualized monetary claims belong in Rule 23(b)(3),'" "the presence of individual damages cannot, by itself, defeat class certification . . . ."  *Leyva v. Medline Indus. Inc.*, 716 F.3d at 514 (quoting *Wal-Mart*, 564 U.S. at 357)).

In the context of a wage and hour claim, an employer's "uniform . . . policies . . . are relevant to the Rule 23(b)(3) analysis," but a district court may not "rely on such policies to the near exclusion of other relevant factors touching on predominance."  *In re Wells Fargo Home Mortg. Overtime Pay Litig.*, 571 F.3d 953, 955 (9th Cir. 2009).  Rather, the court must "consider[] all factors that militate in favor of, or against, class certification."  *Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 946 (9th Cir. 2009) (citation omitted).

Greer points to three common questions of fact and law that he says predominate here: (1) whether DSG's security check policy and practice resulted in employees undergoing security checks off the clock when leaving the store at the end of a shift; (2) whether DSG's

11

security check policy and practice resulted in employees undergoing security checks off the clock when leaving the store for meal or rest breaks; and (3) whether DSG's security check policy and practice violates California law. Pl.'s Mot. 16–17. These questions are subject to common proof, such as relevant DSG policies and testimony from DSG witnesses. *Id.* at 17. Moreover, Greer's expert, Dr. David Lewin, outlines a methodology by which he could administer a stratified survey to a random sample of the putative class to derive the average number of minutes of off-the-clock work. Lewin Decl. ¶¶ 22–28, ECF No. 23-3.[7] By including stratification variables for gender, store size, and location, the survey can capture the major variations across the putative class. *Id.* ¶ 24. With a class of several thousand employees, sample sizes can be selected to ensure a ninety-five percent confidence interval. *Id.* ¶ 24 n.36. Moreover, by including targeted survey questions regarding each work period, Dr. Lewin can produce an average number of minutes of off-the-clock work for meal periods, closing shifts, and non-closing shift. *Id.* ¶ 26. In sum, of the three questions identified above, the first two are subject to common proof based on Dr. Lewin's methodology, and the third is a question of law that may apply across the class.

DSG argues plaintiff does not establish predominance because the amount of time spent off the clock is necessarily an individual determination because *de minimis* time is not compensable. Def.'s Mot. 17 (citing *Corbin v. Time Warner Entm't-Advance/Newhouse P'ship*, 821 F.3d 1069, 1080–81 (9th Cir. 2016); *Troester v. Starbucks Corp.*, No. CV-12-7677 GAF (PJWx), 2014 WL 1004098, at *4–5 (C.D. Cal. Mar. 7, 2014)). "The *de minimis* 'rule' . . . permits 'insubstantial or insignificant periods of time beyond the scheduled working hours' to be 'disregarded.'" *Corbin*, 821 F.3d at 1080 (quoting 29 C.F.R. § 785.47). However, this is a federal doctrine, and "[i]t is not clear that the *de minimis* rule applies under California law." *Stiller v. Costco Wholesale Corp.*, 298 F.R.D. 611, 626 n.7 (S.D. Cal. 2014) (citation omitted). Although the Ninth Circuit has applied the federal doctrine to state law claims, the Circuit

_____

[7] Dr. Lewin selected gender as the main stratification variable because "female employees tend to carry purses/bags more often than male employees," and those items are "always subject to a security check," whereas "[m]ales not carrying any personal belongings may not be subject to as many security checks." Lewin Decl. ¶ 24. A stratified sample ensures a significant number of responses from each group. *Id.*

recently certified the question to the California Supreme Court due to recent developments in state law. *Compare Gillings v. Time Warner Cable LLC*, 583 Fed. App'x 712, 714 (9th Cir. 2014) (applying the *de minimis* rule to California Labor Law claims) *with Troester v. Starbucks Corp.*, 14-55530, 2016 WL 8347245 (9th Cir. June 2, 2016) (recognizing a different outcome may be warranted under *Mendiola v. CPS Sec. Solutions, Inc.*, 60 Cal. 4th 833, 842–43 (2015) and certifying the question to the California Supreme Court).[8] Even if DSG is right that the *de minimis* doctrine applies, there would be common questions regarding whether the class has satisfied the requirements of the *de minimis* doctrine. *See, e.g.*, *Otsuka v. Polo Ralph Lauren Co.*, 251 F.R.D. 439, 48 (N.D. Cal. 2008) ("if defendants are correct that the *de minimis* rule applies to off-the-clock claims brought under California law, then the question whether the time spent by plaintiffs was *de minimis* will still raise other common questions, such as the 'difficulty of recording small amounts of time for payroll purposes' and the regularity with which sales associates and cashiers were made to wait for bag inspections."). At this stage, especially given the uncertain state of California law, the court declines to deny certification on this speculative basis.

Several cases, each of which certified a security check class under similar circumstances, further support a finding of predominance here. *See Bibo v. Federal Express*, No. C07-2505TEH, 2009 WL 1068880, *13–14 (N.D. Cal. Apr. 21, 2009); *Otsuka v. Polo Ralph Lauren Co.*, 251 F.R.D. 439, 447–48 (N.D. Cal. 2008); *Kurihara v. Best Buy Co., Inc.*, No. C06-01884MHP, 2007 U.S. Dist. LEXIS 64224 (2007). In *Kurihara*, for example, the court granted certification in spite of similar concerns raised regarding variations across stores and employees.[9]

---

[8] "The question presented is: Does the federal Fair Labor Standard Act's *de minimis* doctrine, as stated in *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 692 (1946) and *Lindow v. United States*, 738 F.2d 1057, 1063 (9th Cir. 1984), apply to claims for unpaid wages under California Labor Code sections 510, 1194, and 1197." *See Troester v. Starbucks Corporation*, No. S234969 (Cal. ___), available at time of filing of order at http://appellatecases.courtinfo.ca.gov/search/case/mainCaseScreen.cfm?dist=0&doc_id=2145799&doc_no=S234969.

[9] The court grants Greer's request for judicial notice of a recent California Superior Court decision that followed *Kurihara*. *See* RJN (asking the court to notice *In re Aldo U.S. Wage and Hour Cases*, Superior Court of the State of California for the County of Orange, No. JCCP4581 (Sept. 24, 2014)).

*Bibo* and *Otsuka* also certified similar classes in spite of the argument that liability may be precluded by the *de minimis* doctrine. *Bibo,* 2009 WL 1068880, at *13 ("whether the amounts of work in question are *de minimis* is a common question of law"); *Otsuka* at 448 ("if defendants are correct that the *de minimis* rule applies to off-the-clock claims brought under California law, then the question whether the time spent by plaintiffs was *de minimis* will still raise other common questions, such as the 'difficulty of recording small amounts of time for payroll purposes' and the regularity with which sales associates and cashiers were made to wait for bag inspections.").

DSG's cited case, *Ogiamien v. Nordstrom, Inc.*, is distinguishable. 2015 WL 773939, at *5 (C.D. Cal. Feb. 24, 2015). In *Ogiamien*, the district court denied certification of a security check class, relying on two important features of the policy. First, the policy only applied to bags, and therefore did not apply to a substantial portion of the putative class that did not bring bags to work. *Id.* at *4. Nordstrom offered unrefuted evidence that as much as twenty-five percent of the class did not bring a bag to work, and the court was accordingly "concerned with the level of individualized liability inquiries." *Id.* Second, the court focused on Nordstrom's "overwhelming evidence" that its policy was not mandatory for each employee exit, but was instead a policy that was, by its very design, random. *Id.* Nordstrom offered unrefuted evidence that most employees with bags left the store without being subject to a bag check. *Id.* Because this policy of randomness was "not a case of lapses in enforcement," Ogiamien lacked a common way to prove liability across the class. *Id.* at *5.

This case is distinguishable from *Ogiamien* on both bases. First, the security check policy here expressly pertained to "jacket, bags, and other personal belonging[s]," and therefore applied to a greater proportion, if not the entire, putative class. Greer's declarations indicate nearly all class members were subjected to the security check policy. *See* Compendium. DSG's declarations do not substantially undermine that conclusion. *See* Compendium of Putative Class Member Declarations ¶ 8, ECF No. 24-3 (only ten percent of declarants never brought a bag to work and were never subject to security check). Second, the security check policy here was not random by design; rather, its express terms are mandatory "when you leave the building," and deposition testimony supports the conclusion that this policy applied equally to breaks and

14

the end of shifts.  To the extent there is local variation in enforcement, this appears to be a "case of lapses in enforcement" that does not undermine predominance.  *Ogiamien*, 2015 WL 773939 at *5.

Greer has identified three questions subject to common proof that predominate over any individualized inquiries presented here.  The security check subclass satisfies the predominance requirement.

2.    Superiority

Predominance of common questions does not alone justify use of a class action, "for another method of handling the [case] may be available which has greater practical advantages."  Fed. R. Civ. P. 23(b)(3) advisory committee's note to 1966 amendment.  Rule 23(b)(3) requires a court find a class action is the "superior" method of resolution.  *Id.*  This constraint is meant to lead the court "to assess the relative advantages of alternative procedures for handling the total controversy."  *Id.*  Rule 23(b)(3) provides that superiority is determined by considering, for example,

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D) the likely difficulties in managing the class action.

*Id.*; *see also Zinser v. Accuflix Research Inst., Inc.*, 253 F.3d 1180, 1190 (9th Cir. 2001).

The Supreme Court has acknowledged that Rule 23(b)(3) contemplates the "vindication of the rights of groups of people who individually would be without effective strength to bring their opponents into court at all."  *Amchem*, 521 U.S. at 617 (citation and internal quotation marks omitted).  "The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action . . . .  A class action solves this problem by aggregating the relatively paltry potential recoveries . . . ."  *Id.*

15

The court first assesses the proposed subclasses against the factors described in Rule 23(b)(3). Regarding the first factor, "the class members' interests in individually controlling the prosecution or defense of separate claims," Fed. R. Civ. P. 23(b)(3)(A), when smaller dollar amounts are in controversy, this factor generally favors certification. *Zinser*, 253 F.3d at 1190–91. Resolution of this factor takes into account the policy of incentivizing legitimate claims even when individual damages are modest. *Amchem*, 521 U.S. at 617. Large, complex claims do not fit so well in a class as do smaller, simpler claims. *See Zinser*, 253 F.3d at 1190–91. Here, Greer asserts relatively small individual claims for underpayment. *See* Pl.'s Mot. 19 ("For example, if an employee making $10/hour spent three minutes on an off-the-clock security check a day, then DSG underpaid him or her at least $130 for each year of employment."). Such small claims do not make individual litigation attractive or sustainable. This factor favors certification.

The second factor, the "extent and nature of any litigation concerning the controversy already commenced by or against members of the class," Fed. R. Civ. P. 23(b)(3)(B), is meant to "assur[e] judicial economy and reduc[e] the possibility of multiple lawsuits." *Zinser*, 253 F.3d at 1191 (quoting 7A Charles Alan Wright *et al.*, *Federal Practice and Procedure* § 1780 at 568–70 (2d ed. 1986)). Here the parties have not described, and the court is not aware of any other related litigation. This factor favors certification.

The third factor is "the desirability or undesirability of concentrating the litigation" in this forum. Fed. R. Civ. P. 23(b)(3)(C). This is a statewide class action, and thus a non-California forum would appear undesirable. Moreover, Jim Greer worked at a DSG location within this district, and DSG's principal office in the state is in Sacramento. *See* FAC ¶¶ 5–6. Although it would be possible to consider smaller classes within each federal judicial district in the state, a single class action representing class members across the state asserting state claims in the judicial district in which the defendant is located appears sufficiently desirable. This factor favors certification.

The fourth factor weighs the "likely difficulties in managing the class action." Fed. R. Civ. P. 23(b)(3)(D). Greer proposes to conduct trial in two phases: the first to determine liability, and the second to determine damages. *See generally* Pl.'s Trial Plan, ECF No. 23-7.

The first phase relies on DSG's own policy documents as well as witness testimony to determine whether DSG's security check policy violates state law. *Id.* at 5. The second phase relies more heavily on information gathered through Dr. Lewin's stratified survey discussed above, *id.* at 5–11, to determine aggregate damages for the class and individual damages for each class member, *id.* at 8–9. Altogether, Greer estimates the liability phase will take about five to seven court days and the damages phase will require about three to five. *Id.* at 7, 11. DSG has not challenged the manageability of this plan. *See generally* Def.'s Opp'n. On balance, application of the four factors suggests a class action is the superior means to try the common questions of law and fact that predominate here.

The Ninth Circuit has also required district courts to consider alternative means of litigating a proposed class action. *See Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234–35 (9th Cir. 1996) ("A class action is the superior method for managing litigation if no realistic alternative exists."). In particular, individual litigation, joinder, multidistrict litigation, or an administrative or other non-judicial solution may be superior. *See* 7A Charles A. Wright, et al., *Federal Practice & Procedure* § 1779 (3d ed. 2005). Because class members here have modest claims, individual litigation is unlikely to present a viable means of recovery. The number of potential plaintiffs, as many as eight to nine thousand, also makes joinder impracticable. Multidistrict litigation may present an advantage, as some of the relevant evidence may exist in each of the California districts, however the value of the claims is still small enough to suggest individual actions would be inefficient. The security check subclass satisfies the superiority requirement.

D.   Derivative Claims

Greer asks for certification of his "derivative claims," which he describes as all claims tied to claims for off-the-clock work. *See* Pl.'s Mot. 16 (citing, as the derivative claims, those tied to Labor Code sections 510, 1198, 1194, 1197, 1197.1, 201, 202, 203 and 204 and California Business and Professions Code sections 17200, *et seq.*). Defendant opposes only to the extent it argues Greer's underlying claim of off-the-clock work is not entitled to class certification. *See* Def.'s Mot. 22; Def.'s Opp'n 24. Because the court finds certification of

Greer's off-the-clock claims appropriate, the court further certifies the balance of these derivative claims.

This leaves only Greer's request for certification as to his business reimbursement claim under Labor Code section 2802. The court next discusses whether that claim, and the corresponding subclass, warrant certification.

## V.      BUSINESS REIMBURSEMENT SUBCLASS

Greer's proposed business reimbursement subclass relies on a claim for unpaid business expenses under California Labor Code section 2802.

### A.      Applicable Law

California Labor Code section 2802 provides "an employer shall indemnify his or her employee for all necessary expenditures or losses incurred by the employee in direct consequence of the discharge of his or her duties . . . ." Cal. Lab. Code § 2802. Section 2802 "is designed to prevent employers from passing their operating expenses on to their employees." *Gattuso v. Harte-Hanks Shoppers, Inc.*, 42 Cal. 4th 554, 562 (2007). Courts have recognized the "strong public policy . . . favor[ing] the indemnification . . . of employees . . . " *Stuart v. RadioShack*, 641 F. Supp. 2d 901, 903 (N.D. Cal. 2009) (quotation omitted). An employer who "knows or has reason to know that the employees have incurred reimbursable expenses" owes a "duty to exercise due diligence and take any and all reasonable steps to ensure" the employees are fully reimbursed. *Stuart*, 641 F. Supp. 2d at 904 (emphasis added). A contrary rule would be "at war with" section 2802's "strong public policy" favoring indemnification. *Id.*

Consistent with the policy that the employer may not shift onto the employee the cost of doing business, if an employer requires an employee to wear a uniform, he must provide the uniform. *See, e.g.*, Wage Order 7-2001 § 9. The Wage Orders define "uniform" to include "apparel or accessories of distinctive design or color." *See, e.g., id.* § 9(A). The principal exception to the rule is that employers are not responsible for providing uniforms if they require "basic wardrobe items which are usual and generally usable in the occupation, such as white shirts, dark pants and black shoes and belts, all of unspecified design." *Becerra v. Radio Shack Corp.*, No. 4:11-CV-03586YGR, 2012 WL 6115627, *5 (N.D. Cal. Dec. 10, 2012) (citing the

18

1    Industrial Welfare Commission's Statement of Basis for the 1980 iteration of Wage Order 7).

2    Because DSG's required specific "Looks," as described further below, this exception is not

3    applicable here.

4        B.    Evidence

5            Greer relies on testimony from DSG's corporate designees, his deposition

6    testimony, and documents DSG produced during discovery to support his argument that putative

7    class members were required to purchase clothing appropriate to their department without

8    reimbursement.  Pl.'s Mot. 21–23.

9            Greer construes DSG's express "Look Policy" as a mandatory uniform.   The

10   policy operative during the class period states "[i]t is extremely important that our associates

11   dress in a manner that builds our reputation as the best sporting goods retailer in America."  Craig

12   Dep., Ex. 9; *see also id.,* Ex. 7 ("The dress code at Dick's is extremely important").  The policy

13   describes in great detail the three "Looks" that the employees had to dress for at work, depending

14   on the department to which they were assigned: the Athletic Look, the Golf Look and the Lodge

15   Look.  Craig Dep., Ex. 9.  The policy details acceptable and unacceptable types of clothing under

16   the policy.  *Id.*  DSG separately provided highly specific exemplars showing what each Look

17   sought to promote. Craig Dep., Ex. 10.  The policy reflected DSG's decision to have associates

18   dress more like a customer, such that "[w]hether you're a golfer wearing clothes that you would

19   be required on the golf course, or if you're a lodge associate and you're a hunter or a fisher or

20   you're going camping, it's that lifestyle . . . but not necessarily the brands that we carry."  Craig

21   Dep. 103–104.  An employee's failure to follow the policy could lead to discipline "up to and

22   including dismissal."  *Id.*, Ex. 9.

23           Greer points further to evidence that putative class members did not always have

24   clothing that would comply with the Look Policy.  As an example, employees were occasionally

25   reassigned to a different department with a different Look.  Craig Dep. 127:22–128:10.  Although

26   DSG contends the policy was intended to permit employees to wear clothing they had at home,

27   Greer contends this was a mistaken and unsupported belief and that DSG, relying on this

28   mistaken belief, refused to reimburse putative class members who purchased clothing to achieve

the required Look.  DSG had a regular practice of not reimbursing employees for clothing, as the company never reimbursed employees for clothing during the class period.  Craig Dep. 132:20–133:3.

C.   Certification

As with the prior subclass, DSG does not dispute the Business Reimbursement Class meets each of the requirements of Rule 23(a).  *See* Def.'s Mot. 13–24.  The court finds these requirements are met and turns to the Rule 23(b) requirements of predominance and superiority.

1.   Predominance

In examining predominance, the court finds persuasive the decision of a sister court in *Brown v. Abercrombie & Fitch Co.,* No. CV-14-1242-JGB-VBKX, 2015 WL 9690357 (C.D. Cal. July 16, 2015).  In *Brown*, the court certified two classes, one for clothing and one for footwear, based on Abercrombie's "Look Policy" that dictated what an employee may wear.  *Id.* at *14–15, 19–20.  Abercrombie's policy expressly stated employees were not required to buy or wear clothing from the store, but did require employees' clothes to be "similar to the brand" and "consistent with the current fashion season and colors."  *Id.* at *14.  Moreover, the policy prohibited employees from wearing apparel obviously labeled by a label, name, or logo of a competitor.  *Id.*  The court found that whether these requirements describe a uniform for the purposes of California Labor Code section 2802 presented a common question, as did the question whether Look Policy-compliant clothing is "generally useable in the occupation or profession."[10]  *Id.*  In addressing predominance, the court first rejected the defendants' argument that individual inquiries were necessary because employees may not have purchased clothing from defendant stores.  *Id.* at *19.  As the court explained, the court could find that a uniform existed and reimbursement was necessary even if employees did not purchase clothes from the Abercrombie stores; "[i]f a required piece of clothing is of a sufficiently distinctive design or

---

[10] "One relevant exception to the category of uniforms for which an employer must pay is a uniform that is 'generally usable in the [employees'] occupation,' such as a nurse's white uniform."  *Id.* at *14.

color, an employer may be required to reimburse the employee for that purchase even if the item of clothing was purchased elsewhere." *Id.* The court next rejected defendants' argument that its one-time provision of free clothes to some employees required additional individual inquiries. *Id.* "While this issue of free clothes presents an interesting question, the Court concludes that it is appropriately characterized as part of the damages inquiry." *Id.* After finding predominance as to both subclasses for similar reasons, the court went on to certify each class. *Id.* at *20.

As did the defendant in *Brown*, DSG instituted a "Look Policy" that dictated what employees may wear. Craig Dep., Ex. 9; *see also id.,* Ex. 7. Rather than requiring employees to dress "similar to the brand," DSG's Look Policy required employees to comply with one of three established Looks and provided employees with a list of acceptable and unacceptable clothing. *Id.* Also as in *Brown*, DSG's Look Policy expressly stated employees did not have to purchase clothing to satisfy the required Look. These common, underlying policies provide common proof relevant to classwide resolution, and these common questions predominate over any individual inquiry to which DSG points.

DSG's invocation of *Morgan v. Wet Seal* is unavailing. *See* 210 Cal. App. 4th 1341 (2012). In *Morgan*, a California appellate court affirmed a trial court's decision to deny certification of a reimbursement class where it found the underlying policy was not mandatory. Although plaintiffs alleged they were required to purchase Wet Seal apparel, shoes, and accessories, *id.* at 1345, the court found the underlying policy, which only "encouraged" employees to wear Wet Seal merchandise, was not clearly mandatory, *id.* at 1356. "Thus," the court reasoned, "answering the 'central' liability question whether Wet Seal employees were required to wear Wet Seal clothing as a condition of employment or otherwise compelled to purchase Wet Seal merchandise would require several individualized inquiries . . . ." *Id.* Combined with the fact that the policy did not "explain with any specificity" what employees were required to wear, the court found individual inquiries predominated as to what employees were individually told about the policy. *Id.* Here, in contrast to Wet Seal, DSG provided a Look Policy with specific requirements as to what was acceptable. Craig Dep., Ex. 9. Moreover, although the policy may not have been expressly required, DSG maintained a de facto policy by

explaining that compliance was "extremely important" and that non-compliance was a basis for dismissal. As a result, Greer has demonstrated that "answering the central liability question" will not require individualized inquiries. *Morgan*, 210 Cal. App. 4th at 1356.

The business reimbursement subclass satisfies the predominance requirement.

### 2.    Superiority

The business reimbursement subclass satisfies the superiority requirement for the same reasons as the security check subclass. Business reimbursement subclass members do not have a substantial "interests in individually controlling the prosecution or defense of separate claims," Fed. R. Civ. P. 23(b)(3)(A); there is no other "litigation concerning the controversy already commenced by or against members" of the subclass, Fed. R. Civ. P. 23(b)(3)(B); "concentrating the litigation" in this forum is just as desirable as with the other subclass, Fed. R. Civ. P. 23(b)(3)(C); and Dr. Lewin's survey methodology should sufficiently address "likely difficulties in managing the class action," Fed. R. Civ. P. 23(b)(3)(D). The business reimbursement subclass satisfies the superiority requirement.

### D.    Conclusion

The court finds both subclasses satisfy the requirements of Rule 23(a) and Rule 23(b)(3), and certification of the class and corresponding class claims is appropriate.

## VI.    CONCLUSION

The court GRANTS Greer's motion for class certification.

The court DENIES DSG's motion to deny class certification.

A Status Conference is set for May 11, 2017, at 2:30 p.m. The parties shall submit, at least seven (7) days prior to the Status Conference, a Joint Status Report that includes the Rule 26(f) discovery plan, with all named parties participating in the preparation and completion of the report. The parties shall also inform the court whether the status conference is needed, or if the matter should be submitted on the parties' joint report.

/////

/////

/////

IT IS SO ORDERED.

This order resolves ECF Nos. 23, 23-6, 24, 29, 35.

DATED:  April 12, 2017.

_____
UNITED STATES DISTRICT JUDGE