Raul Perez (SBN 174687)
Raul.Perez@capstonelawyers.com
Robert J. Drexler, Jr. (SBN 119119)
Robert.Drexler@capstonelawyers.com
Molly A. DeSario (SBN 230763)
Molly.DeSario@capstonelawyers.com
Jonathan Lee (SBN 267146)
Jonathan.Lee @capstonelawyers.com
Capstone Law APC
1875 Century Park East, Suite 1000
Los Angeles, California 90067
Telephone:     (310) 556-4811
Facsimile:     (310) 943-0396

Attorneys for Plaintiff Plaintiff Jimmy Greer

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JIMMY GREER, individually, and on behalf of others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>DICK'S SPORTING GOODS, INC., a Delaware corporation; and DOES 1 through 100, inclusive,<br><br>Defendants. | Case No. 2:15-cv-01063-KJM-CKD<br><br>The Hon. Kimberly J. Mueller<br><br>**NOTICE OF MOTION AND MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**<br><br>Date:       December 20, 2019<br>Time:       10:00 a.m.<br>Place:      Courtroom 3 |

1  **TO THE HONORABLE COURT, ALL PARTIES, AND THEIR ATTORNEYS**
2  **OF RECORD:**

3        **PLEASE TAKE NOTICE** that on December 20, 2019 at 10:00 a.m., or as soon
4  thereafter as counsel may be heard, in Courtroom 3 of the above-captioned court, located
5  at 501 I Street, Sacramento, CA 95814, the Honorable Kimberly J. Mueller presiding,
6  Plaintiff Jimmy Greer will, and hereby does, move this Court for entry of an order and
7  judgment granting final approval of the class action settlement and all agreed-upon terms
8  therein. This Motion, unopposed by Defendant Dick's Sporting Goods, Inc., seeks final
9  approval of:  (1) the Joint Stipulation of Class Action Settlement and Release; (2)
10 settlement payments to Participating Class Members; and (3) and costs/expenses to the
11 settlement administrator, ILYM Group, Inc.

12       This Motion is based upon:  (1) this Notice of Motion and Motion; (2) the
13 Memorandum of Points and Authorities in Support of Motion for Final Approval of
14 Class Action Settlement; (3) the Declaration of Raul Perez; (4) the Declaration of
15 Nathalie Hernandez; (5) the [Proposed] Order Granting Final Approval of the Class
16 Action Settlement; (6) the [Proposed] Judgment; (7) the records, pleadings, and papers
17 filed in this action; and (8) upon such other documentary and oral evidence or argument
18 as may be presented to the Court at or prior to the hearing of this Motion.

19

20 Dated:  November 22, 2019       Respectfully submitted,

21                         CAPSTONE LAW APC

22                       By:  /s/ Robert J. Drexler, Jr.
23                         Raul Perez
                         Robert J. Drexler, Jr.
24                         Molly DeSario
                         Jonathan Lee

25                       Attorneys for Plaintiff Jimmy Greer

26

27

28

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................1

II.   FACTS AND PROCEDURE ...............................................................................3

      A.   Overview of the Litigation .......................................................................3

      B.   Class Counsel Conducted a Thorough Investigation of the Factual and
           Legal Issues and Were Thus Able to Objectively Assess the
           Settlement's Reasonableness ....................................................................4

      C.   The Parties Settled After Mediation ........................................................5

      D.   The Proposed Settlement Fully Resolves Plaintiff's Claims ...................6

           1.   Composition of the Settlement Class................................................6

           2.   Settlement Consideration..................................................................6

           3.   Release by the Settlement Class.......................................................6

      E.   The Notice and Settlement Administration Process Were Completed
           Pursuant to the Court's Preliminary Approval Order .............................7

III.  ARGUMENT .......................................................................................................8

      A.   The Standard for Final Approval Has Been Met .....................................8

      B.   The Settlement Was Achieved After Evaluating the Strengths of
           Plaintiff's Case and the Risks, Expense, Complexity, and Likely
           Duration of Further Litigation...............................................................10

      C.   The Settlement Was Reached through Arm's-Length Bargaining in
           Which All Parties Were Represented by Experienced Counsel.......................17

      D.   The Parties Conducted a Thorough Investigation of the Factual and
           Legal Issues............................................................................................17

      E.   The Settlement Class Has Responded Positively to the Settlement................18

      F.   The Requested Payment to the Settlement Administrator Is Reasonable
           and Should Receive Final Approval .......................................................19

IV.   CONCLUSION...................................................................................................19

**TABLE OF AUTHORITIES**

**FEDERAL CASES**

*Balderas v. Massage Envy Franchising, LLP,* 2014 WL 3610945. (N.D.
Cal. July 21, 2014) ...........................................................................................16

*Churchill Village, LLC v. General Electric,* 361 F.3d 566 (9th Cir. 2004).......................18

*D'Amato v. Deutsche Bank,* 236 F.3d 78 (2d Cir. 2001) ....................................................17

*Hanlon v. Chrysler Corp.,* 150 F.3d 1011 (9th Cir. 1998)....................................................9

*In re Apple Computer, Inc. Derivative Litig.,* No. C 06-4128 JF (HRL),
2008 U.S. Dist. LEXIS 108195 (N.D. Cal. Nov. 5, 2008) ...........................17

*In Re Armored Car Antitrust Litig.,* 472 F. Supp. 1357 (N.D. Ga. 1979) .......................16

*In Re Four Seasons Secs. Laws Litig.,* 58 F.R.D. 19 (W.D. Okla.1972)...........................16

*In re Global Crossing Sec. and ERISA Litig.,* 225 F.R.D. 436 (S.D.N.Y.
2004)....................................................................................................... 10, 11

*In re IKON Office Solutions, Inc. Sec. Litig.,* 194 F.R.D. 166 (E.D. Pa.
2000)....................................................................................................... 10, 11

*In re Warfarin Sodium Antitrust Litig.,* 212 F.R.D. 231 (D. Del. 2002) ..........................16

*In re: Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab.
Litig.,* No. 2672 CRB (JSC), 2016 WL 4010049 (N.D. Cal. July 26,
2016)...............................................................................................................17

*Linney v. Cellular Alaska P'ship,* 151 F.3d 1234 (9th Cir. 1998)....................................10

*Loud v. Eden Med. Ctr.,* 2013 U.S. Dist. LEXIS 122873 (N.D. Cal. Aug.
28, 2013) .......................................................................................................15

*Molski v. Gleich,* 318 F.3d 937 (9th Cir. 2003) ....................................................................9

*Nat'l Rural Telecom. Coop. v. DIRECTV, Inc.,* 221 F.R.D. 523 (C.D. Cal.
2004)....................................................................................................... 10, 11

*Newman v. Stein,* 464 F. 2d 689 (2d Cir. 1972).............................................................. 10, 11

*Officers for Justice v. Civil Serv. Comm'n,* 688 F.2d 615 (9th Cir. 1982) ..................9, 11

*Rodriguez v. West Pub. Corp.*, 463 F.3d 948 (9th Cir. 2009).........................................9, 11

**STATE CASES**

*7-Eleven Owners for Fair Franchising v. Southland Corp.*, 85 Cal. App.

   4th 1135 (2000) ...........................................................................................................18

*Amaral v. Cintas Corp No. 2*, 163 Cal. App. 4th 1157 (2008).........................................16

**FEDERAL STATUTES**

Fed. R. Civ. P. 23(e) .........................................................................................................8

**STATE STATUTES**

Cal. Lab. Code § 203 .......................................................................................................15

Cal. Lab. Code § 226(e) ...................................................................................................15

**SECONDARY AUTHORITIES**

Manual for Complex Litigation (4th ed. 2004)................................................................8, 9

MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

On August 27, 2019, the Court granted preliminary approval of the Joint Stipulation of Class Action Settlement and Release.[1] The Court subsequently approved distribution of the Notice of Class Action Settlement ("Class Notice") to all Class Members on September 19, 2019. Class Members were given 30 days to opt out or object to the Settlement ("Response Deadline"). Plaintiff is pleased to report that:  (1) not a single Class Member has objected to the Settlement; (2) only 15 individuals opted out of the Settlement Class (less than 0.15% of the Settlement Class); (3) the average payment from the Settlement (combining payments from the Security Check Class Fund and Business Reimbursement Class Fund) is approximately $155, and the highest is approximately $1,235. (Declaration of Nathalie Hernandez ["Hernandez Decl."] ¶¶ 6-8.)

Plaintiff now seeks final approval of this Settlement with Defendant Dick's Sporting Goods, Inc. ("Defendant" or "Dick's") (collectively with Plaintiff, the "Parties"). The principal terms of the Settlement provide for the following:

(1)    A Settlement Class defined as:  All persons who worked at Defendant's California retail stores in non-exempt positions at any time during the period from: (1) March 18, 2011 to January 31, 2015 (the "Security Check Class"); and (2) March 18, 2011 to April 13, 2017 (the "Business Reimbursement Class") (collectively, "Class Members").

(2)    A **non-reversionary** Class Settlement Amount of $2,900,000. The Class Settlement Amount includes:

(a)    A Net Settlement Amount of approximately $1,658,333 (the Class Settlement Amount minus the requested Attorneys' Fees and Costs, Settlement Administration Costs, and Class Representative Enhancement Payment) which will be allocated to all Participating

---

[1] Hereinafter, "Settlement" or "Settlement Agreement."  Unless indicated otherwise, all capitalized terms used herein have the same meaning as those defined by the Settlement Agreement.

Class Members on a pro-rata basis according to the number of weeks that each Class Member worked during the Class Period. **Because the Class Settlement Amount is non-reversionary, 100% of the Net Settlement Amount will be paid to all Participating Class Members.**

(b) Attorneys' fees not to exceed one-third of the Class Settlement Amount (or $966,667) and litigation costs and expenses not to exceed $200,000, to Capstone Law APC ("Class Counsel").

(c) Settlement Administration Costs of $65,000, to be paid to the jointly selected settlement administrator, ILYM Group, Inc. ("ILYM").

(d) A Class Representative Enhancement Payment of $10,000 to Jimmy Greer for his service on behalf of the Settlement Class and for agreeing to a broader release than those required of other Class Members.

An objective evaluation of the Settlement confirms that the relief negotiated on the Class' behalf is fair, reasonable, and valuable. The Settlement was negotiated by the Parties at arm's length with helpful guidance from Mark Rudy, Esq., an experienced and well-respected class action mediator, and the Settlement confers substantial benefits to Class Members. The relief offered by the Settlement to Class Members—**averaging approximately $155**—is particularly impressive when viewed against the difficulties encountered by plaintiffs pursuing wage and hour cases. Indeed, by settling now rather than proceeding to trial, Class Members will not have to wait (possibly years) for relief, nor will they have to bear the risk of class certification being denied or of Defendant prevailing at trial.

Accordingly, given the Settlement's favorable terms and the manner in which these terms were negotiated and received by Class Members, Plaintiff respectfully requests that the Court grant this Motion for Final Approval of the Settlement

Agreement and retain jurisdiction to enforce the Settlement.

## II.      FACTS AND PROCEDURE

### A.      Overview of the Litigation

On March 18, 2015, Mr. Greer filed his initial complaint in the Superior Court of California for the County of Sacramento, alleging proposed class claims for unpaid overtime, unpaid minimum wages, wages not timely paid upon termination, unreimbursed business expenses, and unfair competition. On May 15, 2015, Defendant removed the action to the United States District Court for the Eastern District of California. (Declaration of Raul Perez ["Perez Decl."] ¶ 2; *see* Dkt. No. 1.)

On July 29, 2016, Mr. Greer filed his motion for class certification as to the off-the-clock security check claim, the expense reimbursement claim, and derivative claims. (Dkt. No. 23.) The same day, Defendant filed a motion to deny class certification. (Dkt. No. 24.) On April 13, 2017, the Court denied Defendant's motion to deny class certification and granted Mr. Greer's motion for class certification as to the following two classes: (1) all non-exempt or hourly paid employees who worked for Defendant in its DSG retail stores within California at any time from March 18, 2011 until January 31, 2015[2] (the "Security Check Class"); and (2) all non-exempt or hourly paid employees who worked for Defendant in its DSG retail stores within California at any time from March 18, 2011 until the date of certification (the "Business Reimbursement Class"). (Perez Decl. ¶ 3; Dkt. No. 45.)

On April 27, 2017, Defendant petitioned the United States Ninth Circuit Court of Appeals for permission to appeal the order granting class certification. (Case No. 17-80075.) The trial court litigation was stayed pending resolution of the petition. On July 28, 2017, the Court of Appeals denied the petition for permission to appeal. (Perez Decl. ¶ 4; (9th Cir. Dkt. No. 7.)

On November 10, 2017, Defendant filed a motion to stay the action pending the

---

[2] Additionally, within months after the action was filed, Defendant changed the location of the time clocks in its California stores so that the time employees would undergo the security check process is recorded and paid.

California Supreme Court's answers to the certified questions in *Frlekin v. Apple* (regarding whether security check time is compensable if an employer is only searching bags voluntarily brought to work) and *Troester v. Starbucks* (regarding whether the federal de minimis standard applies to California law claims for off-the-clock security checks). (Dkt. No. 54.) Plaintiff opposed the motion on November 27, 2017, arguing that the outcome of *Frlekin* would have no bearing on Plaintiff's claims because Defendant's security check policy included searching clothing, and not just bags. (Dkt. No. 58.) Further, Plaintiff argued that the outcome of *Troester* would be purely an issue of damages, and not class certification or liability. (*Id.*) On January 10, 2018, the Court denied Defendant's motion in its entirety, reasoning that the California Supreme Court could take an inordinate amount of time to decide *Frlekin* and *Troester*, and that the prolonged delay would unduly prejudice Plaintiff and the class. (Perez Decl. ¶ 5; Dkt. No. 64.)

Simultaneously with Defendant's motion to stay on November 10, 2017, Plaintiff filed a motion for approval of Plaintiff's proposed class notice, wherein class members were allowed to opt out by submitting a form through the mail, and class counsel would pay the cost of class notice administration. (Dkt. No. 55.) Defendant insisted that class members also be allowed to opt out by e-mail or text message, despite the extra cost of allowing those procedures. (Dkt. No. 56.) On February 7, 2018, the Court ordered the dissemination of class notice with some changes dictated by the Court; the parties were to allow opt-out by e-mail, with the additional cost of that procedure borne by Defendant. Class notice was mailed on April 19, 2018. (Perez Decl. ¶ 6; Dkt. No. 66.)

**B.     Class Counsel Conducted a Thorough Investigation of the Factual and Legal Issues and Were Thus Able to Objectively Assess the Settlement's Reasonableness**

The Settlement is the product of informed negotiations following extensive investigation by Class Counsel. During this matter's pendency, the Parties thoroughly investigated and researched the claims in controversy, their defenses, and the developing

body of law. The investigation entailed the exchange of information pursuant to formal and informal discovery methods, including interrogatories and document requests. In the course of written discovery, Class Counsel received and analyzed several hundred pages of documents, including Defendant's written policies regarding the claims at issue, and a sample of employee time records and retained an expert. Dr David Lewin, to review store video footage that captured a portion of the security check process. (Perez Decl. ¶ 7.)

In addition to written discovery, the Parties took a total of 7 depositions: Plaintiff's deposition, Defendant's 30(b)(6) witnesses (Karen Craig and Todd Kraemer), Defendant's employee witnesses (Jason D. Link and Jih Hao Cheng), Plaintiff's expert witnesses (Dr. David Lewin, Ph.D. and Robert Crandall). (Perez Decl. ¶ 8.)

Overall, Class Counsel performed an exhaustive investigation into the claims at issue, which included:  (1) determining Plaintiff's suitability as a putative class representative through interviews, background investigations, and analyses of his employment files and related records; (2) evaluating Plaintiff's potential class claims; (3) researching similar wage and hour class actions as to the claims brought, the nature of the positions, and the relevant labor force; (4) analyzing Defendant's labor policies and practices; (5) deposing Defendant's corporate and lay witnesses, and defending Plaintiff's deposition and the depositions of Plaintiff's experts;  (6) researching settlements in similar cases; (7) conducting a discounted valuation analysis of claims; (8) drafting the mediation brief; (9) participating in mediation; and (10) finalizing the Settlement Agreement. The extensive document and data exchanges have allowed Class Counsel to appreciate the strengths and weaknesses of the claims alleged against Defendants and the benefits of the proposed Settlement. (Perez Decl. ¶ 9.)

### C.     The Parties Settled After Mediation

After the exchange of relevant information and evidence, the Parties agreed to enter into private mediation in an attempt to resolve the claims in the case.  The mediation took place on December 10, 2018, before Mark Rudy, Esq., an experienced

wage and hour mediator.  Mr. Rudy helped to manage the Parties' expectations and provided a useful, neutral analysis of the issues and risks to both sides. Although the Parties did not settle at mediation, Mr. Rudy continued to guide the Parties' toward settlement and eventually issued a mediator's proposal, which recommended the terms of a class action settlement. The Parties eventually accepted Mr. Rudy's proposal and were able to consummate a complete settlement of Plaintiff's claims, including Plaintiff's claims for attorneys' fees and costs. (Perez Decl. ¶ 11.)

### D.   The Proposed Settlement Fully Resolves Plaintiff's Claims

#### 1.   Composition of the Settlement Class

The Settlement Class consists of all persons who worked at Defendant's California retail stores in non-exempt positions at any time during the period from: (1) March 18, 2011 to January 31, 2015 (the "Security Check Class"); and (2) March 18, 2011 to April 13, 2017 (the "Business Reimbursement Class"). (Settlement Agreement ¶ 5.)

#### 2.   Settlement Consideration

Plaintiff and Defendant have agreed to settle all claims alleged in the action in exchange for the Class Settlement Amount of $2,900,000. The Class Settlement Amount includes: (1) a $1,658,333 Net Settlement Amount which will be paid to all Participating Class Members; (2) $966,667 in attorneys' fees and up to $200,000 in litigation costs/expenses to Class Counsel; (3) Settlement Administration Costs of $65,000; and (4) a Class Representative Enhancement Payment of $10,000 to Plaintiff Jimmy Greer for his service on behalf of the Settlement Class and for a general release of all claims arising out of his employment. (Settlement Agreement ¶¶ 2, 7-8, 24, 30.)

#### 3.   Release by the Settlement Class

In exchange for the Class Settlement Amount, Plaintiff and Participating Class Members during the applicable Class Period:

**For Security Check Class Members**: any and all claims, rights, demands, liabilities, and causes of action, arising from, arising in connection to, or relating to, the allegation(s) that Defendant (or any Released Party) failed to

properly compensate employees for security searches during the Security Check Class Period, including (but not limited to) claims for unpaid over or double time (Labor Code §§ 510 and 1198), minimum wages or straight time (Labor Code §§ 1194, 1197, and 1197.1), off-the-clock work or time subject to employer's control, failure to pay timely wages during employment or upon termination (Labor Code §§ 201-204), inaccurate wage statements (Labor Code § 226), violation of California Business & Professions Code §§ 17200, et seq, violation of any Wage Order of the Industrial Welfare Commission, any related claims for exemplary damages, penalties, and interest, any related claims for attorneys' fees and costs (excluding any such fees and costs identified in the Settlement Agreement), and/or any other claims, rights, demands, liabilities, or causes of action which could have been asserted in the Action based on the same or similar factual predicate, under any state, federal or local law; and

**For Business Reimbursement Class Members**: Any and all claims, rights, demands, liabilities, and causes of action, arising from, arising in connection with, or relating to, the allegation(s) that Defendant (or any other Released Party) failed to reimburse for business expenses during the Business Reimbursement Class Period, including (but not limited to) claims for unpaid business-related expenses (Labor Code § 2802), violation of California Business & Professions Code §§ 17200, et seq., violation of any Wage Order of the Industrial Welfare Commission, any related exemplary damages, penalties, or interest, any related claims for attorneys' fees and costs (excluding any such fees and costs identified in this Agreement), and/or any other claims, rights, demands, liabilities, or causes of action which could have been asserted in the Action based on the same or similar factual predicate, under any state, federal or local law.

(Settlement Agreement ¶ 35.)

**E.      The Notice and Settlement Administration Process Were Completed Pursuant to the Court's Preliminary Approval Order**

As authorized by the Court's Order preliminarily approving the Settlement Agreement, the Parties engaged ILYM to provide settlement administration services. (Hernandez Decl. ¶ 2.)  On September 19, 2019, ILYM received the Class Notice prepared jointly by Class Counsel and counsel for Defendant and approved by the Court. (*Id.* at ¶ 3.)  The Class Notice summarized the Settlement's principal terms, provided Class Members with an estimate of how much they would be paid if the Settlement received final approval, and advised Class Members about how to opt out of the Settlement and how to object. (Hernandez Decl., Ex. A.)

Separately, counsel for Defendant provided ILYM with a mailing list (the "Class List"), which included each Class Member's full name, last known address, Social

Security Number, and information necessary to calculate payments. (Hernandez Decl. ¶ 3.)  The mailing addresses contained in the Class List were processed and updated using the National Change of Address Database maintained by the U.S. Postal Service. (*Id.* at ¶ 4.)  On October 2, 2019, ILYM mailed Class Notices to Class Members via First-Class U.S. mail. (*Id.*)  Class Members were given until November 1, 2019 to opt out or object to the Settlement. Plaintiff is pleased to report that to date, no Class Members have objected to the Settlement, and only 15 individuals have opted out of the Settlement Class (less than 0.15% of the Settlement Class). (*Id.* ¶¶ 6-7.)

## III.   ARGUMENT

### A.   The Standard for Final Approval Has Been Met

A class action may only be settled, dismissed, or compromised with the Court's approval. Fed. R. Civ. Proc. 23(e). The process for court approval of a class action settlement is comprised of three principal stages:

Preliminary Approval:  The proposed settlement agreement is preliminarily reviewed by the Court for fairness, adequacy, and reasonableness. If the Court believes the settlement falls within the range of reasonableness, such that proceeding to a formal fairness hearing is warranted, it orders notice of the settlement disseminated to the class. *See* Manual for Complex Litigation § 21.632 (4th ed. 2004).

Class Notice:  Notice of the settlement is disseminated to the class, giving class members an opportunity to object to the settlement's terms or preserve their right to bring an individual action by opting out. *See id.*, § 21.633.

Final Approval:  A formal fairness or final-approval hearing is held by the Court, at which class members can be heard regarding the settlement, and at which evidence and argument concerning the fairness, adequacy, and reasonableness of the settlement is presented.[3]  Following the hearing, the Court decides whether to approve the settlement

---

[3] A proposed class action settlement may be approved if the Court, after allowing absent class members an opportunity to be heard, finds that the settlement is "fair, reasonable, and adequate." In making this determination, "the court's intrusion upon what is otherwise a private consensual agreement negotiated between the parties to a

1    and enter a final order and judgment. *See id.*, § 21.634.

2        The first two steps have been completed. The Court has preliminarily reviewed

3    the proposed settlement for fairness and found it to be within the range of reasonableness

4    meriting court approval. (*See* Order Granting Preliminary Approval of Class Settlement,

5    Dkt. No. 77.)  In addition, the Settlement Administrator has notified Class Members of

6    the proposed settlement and upcoming fairness hearing as directed by the Court. (*See*

7    *generally* Hernandez Decl.)  Plaintiff now moves the Court to grant final approval of the

8    proposed settlement.

9        The decision about whether to approve the proposed settlement is committed to

10   the sound discretion of the trial judge, and will not be overturned except upon a strong

11   showing of a clear abuse of discretion. *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026-

12   27 (9th Cir. 1998).  The Ninth Circuit has set forth a list of non-exclusive factors that a

13   district court should consider in deciding whether to grant final approval, namely: (1) the

14   strength of plaintiffs' case, and the risk, expense, complexity, and likely duration of

15   further litigation; (2) the risk of maintaining class action status throughout the trial; (3)

16   the amount offered in settlement; (4) the extent of discovery completed, and the stage of

17   the proceedings; (5) the experience and views of counsel; and (6) the reaction of the

18   class members to the proposed settlement. *Id.* at 963 (*citing Molski v. Gleich*, 318 F.3d

19   937, 953 (9th Cir. 2003)).

20       These factors, which are discussed below, confirm that the proposed settlement is

21   more than fair, reasonable, and adequate for Class Members. The settlement provides

22   considerable value; Class Members need not bear the risk and delay associated with trial

23   proceedings to obtain these benefits; and the Settlement has been met with substantial

24

25   lawsuit must be limited to the extent necessary to reach a reasoned judgment that the
     agreement is not the product of fraud or overreaching by, or collusion between, the

26   negotiating parties, and that the settlement, taken as a whole, is fair, reasonable and
     adequate to all concerned." *Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 965 (9th Cir.

27   2009) (*quoting Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998)); *see also
     Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 625 (9th Cir. 1982)

28   ("voluntary conciliation and settlement are the preferred means of dispute resolution.
     This is especially true in complex class action litigation . . . .").

1   support and no opposition from Class Members.

2       **B.**    **The Settlement Was Achieved After Evaluating the Strengths of**

3               **Plaintiff's Case and the Risks, Expense, Complexity, and Likely**

4               **Duration of Further Litigation**

5       Federal district courts recognize that there is an inherent "range of

6   reasonableness" in determining whether to approve a settlement "which recognizes the

7   uncertainties of law and fact in any particular case and the concomitant risks and costs

8   necessarily inherent in taking any litigation to completion." *Newman v. Stein*, 464 F. 2d

9   689, 693 (2d Cir. 1972). *See Nat'l Rural Telecomm. Coop. v. Directv, Inc.*, 221 F.R.D.

10  523, 527 (C.D. Cal. 2004) ("well settled law that a proposed settlement may be

11  acceptable even though it amounts to only a fraction of the potential recovery").[4]

12      As discussed in detail below, an objective evaluation of the Settlement confirms

13  that the relief negotiated on the Class' behalf—a $2,900,000 non-reversionary total Class

14  Settlement Amount—is fair, reasonable, and valuable. The Settlement was negotiated by

15  the Parties at arm's length with helpful guidance from Mark Rudy, Esq., and the

16  Settlement confers substantial benefits to Class Members. The relief offered by the

17  Settlement is particularly impressive when viewed against the difficulties encountered by

18  plaintiffs pursuing wage and hour cases.

19      In determining whether a settlement agreement is fair, adequate, and reasonable

20  to all concerned, the Court may consider the strength of the plaintiff's case and the

21  amount offered in settlement, among other factors. *Linney v. Cellular Alaska P'ship*, 151

22  F.3d 1234, 1242 (9th Cir. 1998). Ultimately, "the district court's determination is

23  nothing more than an amalgam of delicate balancing, gross approximations, and rough

24  justice," and there is no single "formula" to be applied; rather, the Court may presume

25          [4] *See also In re Global Crossing Sec. and ERISA Litig.*, 225 F.R.D. 436, 460

26  (S.D.N.Y. 2004) ("settlement amount's ratio to the maximum potential recovery need
    not be the sole, or even dominant, consideration when assessing settlement's fairness");

27  *In re IKON Office Solutions, Inc. Sec. Litig.*, 194 F.R.D. 166, 184 (E.D. Pa. 2000) ("the
    fact that a proposed settlement constitutes a relatively small percentage of the most

28  optimistic estimate does not, in itself, weigh against the settlement; rather the percentage
    should be considered in light of strength of the claims").

that the parties' counsel and the mediator arrived at a reasonable range of settlement by considering Plaintiff's likelihood of recovery. *Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 625 (9th Cir. 1982); *Rodriguez v. West Pub. Corp*., 563 F.3d 948, 965 (9th Cir. 2009).

Federal district courts recognize that there is an inherent "range of reasonableness" in determining whether to approve a settlement "which recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion." *Newman v. Stein*, 464 F. 2d 689, 693 (2d Cir. 1972); *see also Nat'l Rural Telecomm. Coop. v. Directv, Inc.*, 221 F.R.D. 523, 527 (C.D. Cal. 2004) ("well settled law that a proposed settlement may be acceptable even though it amounts to only a fraction of the potential recovery").[5]

Plaintiff calculated Defendant's maximum potential exposure for the security inspection claim and business expense reimbursement claims, and derivative claims, as follows:

Security Inspection Claim. California law defines "hours worked" as "the time during which an employee is subject to the control of an employer, and includes all the time the employee is suffered or permitted to work, whether or not required to do so." *Morillion v. Royal Packing Co.*, 22 Cal. 4th 575, 578 (2000). Thus, "an employee who is subject to an employer's control does not have to be working during that time to be compensated." *Id.* at 582. Requiring employees to work without compensation violates California's minimum wage and overtime laws. *See* Cal. Lab. Code §§ 510, 1194, 1197, 1197.1 and 1198. An employer is liable for off-the-clock "hours worked" if it "knew or should have known off-the-clock work was occurring." *Brinker*, 53 Cal. 4th at 1051-52.

---

[5] *See also In re Global Crossing Sec. and ERISA Litig.*, 225 F.R.D. 436, 460 (S.D.N.Y. 2004) ("settlement amount's ratio to the maximum potential recovery need not be the sole, or even dominant, consideration when assessing settlement's fairness"); *In re IKON Office Solutions, Inc. Sec. Litig.*, 194 F.R.D. 166, 184 (E.D. Pa. 2000) ("the fact that a proposed settlement constitutes a relatively small percentage of the most optimistic estimate does not, in itself, weigh against the settlement; rather the percentage should be considered in light of strength of the claims").

1  Plaintiff alleges that Defendant employed a California-wide policy of requiring

2  managerial personnel to search all employees before they left store premises, including

3  inspections of jackets and other clothing for employees who were not carrying bags.  On

4  January 31, 2015, Defendant installed time punch terminals at store exits and started

5  paying for this time.

6  Based on information and evidence produced by Defendant, Plaintiff determined

7  that Class Members worked a total of approximately 880,220 shifts during the period

8  from March 18, 2011 to January 31, 2015. Conservatively estimating that all security

9  checks during a particular shift lasted on average approximately 6 minutes, Defendant's

10  maximum potential exposure for the security-check claim would be approximately

11  $1.43 million: 880,220 shifts x $16.22 average hourly rate x 0.1-hour duration of

12  security-check = $1,427,717.

13  Plaintiff determined an appropriate range of recovery for settlement purposes by

14  offsetting Defendant's maximum theoretical liability by:  (i) the strength of Defendant's

15  defenses on the merits; (ii) the risk of losing on any of a number of dispositive motions

16  that could have been brought between certification and trial (e.g., motions to decertify

17  the class, motions for summary judgment, and/or motions in limine) that might have

18  eliminated all or some of Plaintiff's claims; (iii) the risk of losing at trial; (iv) the chances

19  of a favorable verdict being reversed on appeal; and (v) the difficulties attendant to

20  collecting on a judgment (the "Discount Factors").

21  With respect to affirmative defenses, Defendant argued that security inspections

22  were performed only sporadically at stores, and that Class Members were regularly

23  "waved through" inspection. *See* Dkt. No. 27, Opposition to Plaintiff's Motion for Class

24  Certification ["Opp."] 8:15-20. In support of this contention, Defendant presented

25  evidence that security inspections were not enforced for almost 2 years at its Modesto,

26  California store, but instead left to the Class Members to decide whether they wanted to

27  voluntarily participate. *Id.*

28  Defendant also argued that there is no violation of California law when an

1    employee voluntarily brings a bag to work since undergoing a bag check does not

2    constitute "hours worked." *Frlekin v. Apple Inc.*, 2015 WL 6851424, at *3 (N.D. Cal.

3    Nov. 7, 2015). *See* Opp. 9:4-6.

4       <u>Business Expense Reimbursement Claim</u>. Labor Code section 2802 requires

5    employers to "indemnify" employees for "for all necessary expenditures or losses

6    incurred by the employee in direct consequence of the discharge of his or her duties, or

7    of his or her obedience to the directions of the employer[.]" Cal. Lab. Code § 2802.

8    Plaintiff alleges that Defendant failed to reimburse Class Member for clothing expenses,

9    and despite requiring Class Members to wear specific styles of clothing suitable to their

10    assigned department, such as the "Athletic Look," "Golf Look," or outdoorsy "Lodge

11    Look."

12       Based on information and evidence produced by Defendant, Plaintiff determined

13    that Defendant employed approximately 10,700 individuals in non-exempt positions

14    during the Class Period. Conservatively estimating that each Class Member incurred up

15    to $200 in costs for work clothes, Defendant's maximum potential exposure would be

16    $2,140,000.

17       Plaintiff determined an appropriate range of recovery for settlement purposes by

18    offsetting Defendant's maximum theoretical liability by the Discount Factors. With

19    respect to affirmative defenses, Defendant argued that the "majority" of Class Members

20    already owned the attire that they wore to work prior to working for Defendant (*see* Opp.

21    2:26-3:9), and that the "Look Policy" was really intended to serve as "guidance" for

22    what Class Members should wear to work, and was not "not really a policy," and in

23    either event, was not "not enforced." *See* Opp. 3:1-5.

24       <u>Wage Statements</u>. Based on the foregoing allegations, Plaintiffs allege that

25    Defendant issued Class Members wage statements that did not comply with Labor Code

26    section 226(a). Labor Code section 226(a) provides, in pertinent part, that an employer

27    must provide an "accurate itemized" wage statement showing net and gross wages

28    earned. Cal. Lab. Code § 226(a). "[A]n employee has a statutory right to an accurate pay

stub." *Jaimez v. Daiohs USA, Inc.*, 181 Cal. App. 4th 1286, 1306 (2010) ("*Jaimez*"). "The purpose of the wage statement requirement is to provide transparency as to the calculation of wages. A complying wage statement accurately reports most of the information necessary for an employee to verify if he or she is being properly paid in accordance with the law and that deductions from wages are proper." DLSE Opinion Letter 2006.07.06 at 2. One of the requirements for a legally compliant wage statement is that it includes "the name and address of the legal entity that is the employer." Labor Code § 226(a)(8) (emphasis added).

Penalties for wage statement violations are calculated according to the formula provided by Labor Code section 226(e)(1): An employee suffering injury as a result of a knowing and intentional failure by an employer to comply with subdivision (a) is entitled to recover the greater of all actual damages or fifty dollars ($50) for the initial pay period in which a violation occurs and one hundred dollars ($100) per employee for each violation in a subsequent pay period, not to exceed an aggregate penalty of four thousand dollars ($4,000), and is entitled to an award of costs and reasonable attorney's fees.

However, Defendant would have argued (by analogy to case law interpreting penalties under Labor Code sections 201 and 225.5), that it would be improper to assess $100 penalties for "subsequent violations" as there has been no formal finding of any "initial" violations. *See Amaral v. Cintas Corp. No. 2*, 163 Cal. App. 4th 1157, 1209 (2008) ("Although common sense might suggest a "subsequent" violation is nothing more than a violation that occurs at a later point in time after an "initial" violation, this definition is inadequate because the statutes provide for multiple penalties for "each failure to pay each employee" incurred in an initial violation . . . Until the employer has been notified that it is violating a Labor Code provision (whether or not the Commissioner or court chooses to impose penalties), the employer cannot be presumed to be aware that its continuing underpayment of employees is a "violation" subject to penalties.")

While Plaintiff does not agree with this interpretation of Section 226(a), he decided to conservatively estimate Defendant's maximum potential exposure for wage statement penalties by assessing a $50 penalty for all pay periods at issue: 27,617 two-week pay periods in the statutory one-year claims period when security inspections were off-the-clock x $50 = $1,380,850.

Plaintiff had to discount Defendant's estimated exposure by the strength of its affirmative defenses and the risks of continued litigation. With respect to the affirmative defenses, defendants commonly argue that, without more, wage statement claims are nothing but technical violations for which Class Members suffer no injury. Before Section 226(e) was amended, the dispositive issue was whether "suffering injury" was satisfied by the deprivation of a legal right (i.e., an employer's provision of non-compliant wage statements), or by consequential damages caused by the non-compliant wage statements. Employers in federal court have prevailed in arguing for the latter interpretation. Even after the enactment of section 226(e), some courts have held that this amendment merely clarifies existing law and have held that plaintiffs must demonstrate actual injury. *See Loud v. Eden Med. Ctr.*, 2013 U.S. Dist. LEXIS 122873, **36-53 (N.D. Cal. Aug. 28, 2013) (granting summary judgment on wage statement claim because plaintiff could not show injury due to defects and that incorrect wage information is not willful).

<u>Waiting-Time Penalties</u>. Where an employer "willfully fails" to timely pay wages upon termination of employment, "the wages of the employee shall continue as a penalty from the due date thereof at the same rate until paid or until an action therefor is commenced," for up to thirty days. *See* Cal. Labor Code § 203.

Plaintiff estimated Defendants' maximum potential exposure for 203 penalties at $12,244,072, which was calculated by taking the product of the following: 4,575 former employees during the 3-year SOL x 5.5-hour average shift x $16.22 average hourly wage x 30 days of penalties = $12,244,072.50. Plaintiff recognizes that Defendants would have argued that an employer has a complete defense to a waiting-time penalty

claim based on a showing of good faith. *Amaral v. Cintas Corp No. 2*, 163 Cal. App. 4th 1157, 1204 (2008) ("So long as no other evidence suggests the employer acted in bad faith, presentation of a good faith defense, based in law or fact, will negate a finding of willfulness.")

<u>The Class Settlement Amount Is Fair and Reasonable</u>. In aggregate, Plaintiff estimated Defendant's maximum potential exposure for the claims at issue at approximately $17.2 million.

| Claim | Maximum Potential Amount |
|---|---|
| Security Inspection Claim | $1,427,717.00 |
| Business Expense Claim | $2,140,000.00 |
| Wage-Statement Claim | $1,380,850.00 |
| Waiting-Time Penalty Claim | $12,244,072.50 |
| **Total** | **$17,192,639.50** |

Taking into account the Discount Factors, and the risks of continued litigation, Plaintiffs determined that a settlement of approximately 17% of Defendant's maximum potential exposure for the class claims was fair and reasonable. *See, e.g., In re Warfarin Sodium Antitrust Litig.,* 212 F.R.D. 231, 256-58 (D. Del. 2002) (recognizing that a reasonable settlement amount can be 1.6% to 14% of the total estimated damages); *In Re Armored Car Antitrust Litig.,* 472 F. Supp. 1357, 1373 (N.D. Ga. 1979) (settlements with a value of 1% to 8% of the estimated total damages were approved); *In Re Four Seasons Secs. Laws Litig.,* 58 F.R.D. 19, 37 (W.D. Okla.1972) (approving 8% of damages); *Balderas v. Massage Envy Franchising, LLP,* 2014 WL 3610945, at *5 (N.D. Cal. July 21, 2014) (finding that settlement which amounted to 8% of maximum recovery "[fell] within the range of possible initial approval based on the strength of plaintiff's case and the risk and expense of continued litigation."); *In re Omnivision Techs., Inc.,* 559 F. Supp. 2d 1036, 1042 (N.D. Cal. 2008) (approving settlement of 6% to 8% of estimated damages).

**C.     The Settlement Was Reached through Arm's-Length Bargaining in Which All Parties Were Represented by Experienced Counsel**

As discussed above, the Settlement is the result of arm's-length negotiations by experienced counsel. The Parties participated in mediation with Mr. Mark Rudy, a respected mediator of wage and hour class actions. Mr. Rudy helped to manage the Parties' expectations and provided a useful, neutral analysis of the issues and risks to both sides. A mediator's participation weighs considerably against any inference of a collusive settlement. *See In re Apple Computer, Inc. Derivative Litig.*, No. C 06-4128 JF (HRL), 2008 U.S. Dist. LEXIS 108195 (N.D. Cal. Nov. 5, 2008); *D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001) (a "mediator's involvement in pre-certification settlement negotiations helps to ensure that the proceedings were free of collusion and undue pressure.")  At all times, the Parties' negotiations were adversarial and non-collusive.

The Parties were represented by experienced class action counsel throughout the negotiations resulting in this Settlement. Plaintiff is represented by Capstone. Capstone employs seasoned class action attorneys who regularly litigate wage and hour claims through certification and on the merits, and have considerable experience settling wage and hour class actions. (*See* Perez Decl. ¶¶ 12-14, Ex. 1.)  Defendant is represented by Sheppard, Mullin, Richter & Hampton LLP, which operates a respected wage and hour defense practice.

As this Settlement is the "result of arms'-length negotiations by experienced class counsel, [it is] entitled to [a] presumption of fairness.'" *In re: Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*, No. 2672 CRB (JSC), 2016 WL 4010049, at *14 (N.D. Cal. July 26, 2016) (internal citation omitted).

**D.     The Parties Conducted a Thorough Investigation of the Factual and Legal Issues**

As set forth in greater detail above, based on their analysis of documents and class data produced by Defendant, Class Counsel were able to realistically assess the value of

1    Plaintiff's claims and intelligently engage defense counsel in settlement discussions that

2    culminated in the proposed settlement now before the Court. (Perez Decl. ¶¶ 7-9.)

3         By engaging in a thorough investigation and evaluation of Plaintiff's claims,

4    Class Counsel can opine that the Settlement, for the consideration and on the terms set

5    forth in the Settlement Agreement, is fair, reasonable, and adequate, and is in the best

6    interests of Class Members in light of all known facts and circumstances, including the

7    risk of significant delay and uncertainty associated with litigation, various defenses

8    asserted by Defendant. (Perez Decl. ¶ 10.)

9         **E.      The Settlement Class Has Responded Positively to the Settlement**

10        The Settlement Class' response to date demonstrates its support for this

11   settlement—not a single Class Member has objected to the Settlement and less than

12   0.15% of the Settlement Class opted out. (Hernandez Decl. ¶¶ 6-7.)  The average

13   settlement payment is approximately $155, and a highest payment is approximately

14   $1,235. (Hernandez Decl. ¶ 8.)  A low number of opt-outs and objections is a strong

15   indicator that a settlement is fair and reasonable. *7-Eleven Owners for Fair Franchising*

16   *v. Southland Corp.*, 85 Cal. App. 4th 1135, 1152-53 (2000) (class response favorable

17   where "[a] mere 80 of the 5,454 national class members elected to opt out  [(1.5% of the

18   entire Class)] and . . . [a] total of nine members . . . objected to the settlement); *Churchill*

19   *Village, LLC v. General Electric*, 361 F.3d 566 (9th Cir. 2004) (affirming settlement

20   approval where 45 of approximately 90,000 notified class members objected and 500

21   opted out). The Settlement Class' response—both in the low rate of opt-outs and the

22   complete absence of objectors—compares favorably to those cases and warrants final

23   approval.

24        Additionally, the average recovery is significantly higher than many wage and

25   hour class action settlements approved by California state and federal courts.  *See*, *e.g.*,

26   *Badami v. Grassroots Campaigns, Inc.*, Case No. C 07-03465 JSW (N.D. Cal. Sept. 15,

27   2008) (average net recovery of approximately $195); *Sandoval v. Nissho of Cal., Inc.*,

28   Case No. 37-2009-00091861 (San Diego County Super. Ct.) (average net recovery of

1 approximately $145); *Fukuchi v. Pizza Hut*, Case No. BC302589 (L.A. County Super.

2 Ct.) (average net recovery of approximately $120); *Contreras v. United Food Group,*

3 *LLC*, Case No. BC389253 (L.A. County Super. Ct.) (average net recovery of

4 approximately $120); *Ressler v. Federated Department Stores, Inc.*, Case No.

5 BC335018 (L.A. County Super. Ct.) (average net recovery of approximately $90); *Doty*

6 *v. Costco Wholesale Corp.*, Case No. CV05-3241 FMC-JWJx (C.D. Cal. May 14, 2007)

7 (average net recovery of approximately $65); *Sorenson v. PetSmart, Inc.*, Case No. 2:06-

8 CV-02674-JAM-DAD (E.D. Cal.) (average net recovery of approximately $60); *Lim v.*

9 *Victoria's Secret Stores, Inc.*, Case No. 04CC00213 (Orange County Super. Ct.)

10 (average net recovery of approximately $35); and *Gomez v. Amadeus Salon, Inc.*, Case

11 No. BC392297 (L.A. Super. Ct.) (average net recovery of approximately $20).

### F. The Requested Payment to the Settlement Administrator Is Reasonable and Should Receive Final Approval

14 Plaintiff requests final approval of settlement administration costs in the amount

15 of $65,000. (Hernandez Decl. ¶ 9, Ex. B.)  ILYM has promptly and properly distributed

16 the Class Notice to all Class Members and completed its duties in accordance with the

17 settlement terms and the Court's preliminary approval Order. (*See generally* Hernandez

18 Decl.)  Accordingly, the $65,000 payment is fair and reasonable and should be accorded

19 final approval along with the rest of the Settlement terms.

### IV. CONCLUSION

21 The Parties have negotiated a fair and reasonable settlement of a case that

22 provides relief that likely would never have been realized but for this class action.

23 Accordingly, final approval of the Settlement should be granted.

Dated:  November 22, 2019

Respectfully submitted,

CAPSTONE LAW APC

By: /s/ Robert J. Drexler, Jr.
Raul Perez
Robert J. Drexler, Jr.
Molly DeSario
Jonathan Lee

Attorneys for Plaintiff Jimmy Greer

MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT